**McKINNON et ux. v. MONARCH LOAN CO. et al.**

No. 13513—Opinion Filed June 9, 1925.

Rehearing Denied Sept. 8, 1925.

**1. Conversion—Measure of Damages.**

The detriment caused by the wrongful conversion of personal property is presumed to be: first, the value of the property at the time of the conversion, with the interest from that time; or, second, where the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict without interest at the option of the injured party; and third, a fair compensation for the time and money properly expended in pursuit of the property. Section 5999, Comp. St. 1921.

**2. Same—Diligent Prosecution of Action—Question of Law.**

Whether an action for conversion has been prosecuted with reasonable diligence within the purview of the second subdivision of section 5999, Comp. St. 1921, is a question of law for the court.

**3. Banks and Banking—Payment of Check on Deposit—Necessity for Proper Demand during Banking Hours.**

A deposit in a bank subject to check imposes on the bank, in the absence of any contract to the contrary, the duty of paying on account of the deposit only on a proper demand therefor by check at the bank during banking hours, and a breach of the bank's obligation to pay on proper demand is essential to a cause of action for the deposit.

(Syllabus by Pinkham, C.)

Commissioners' Opinion, Division No. 5.

Error from District Court, Garvin County; C. C. Smith, Assigned Judge.

Action by Monarch Loan Company against G. G. McKinnon and Lula McKinnon, Farmers Exchange Bank made party defendant. From judgment in favor of Farmers Exchange Bank, defendants G. G. McKinnon and Lula McKinnon bring error. Affirmed.

H. M. Carr, for plaintiffs in error.

Blanton, Osborn & Curtis, for defendants in error.

Opinion by PINKHAM, C. This was an action instituted by the Monarch Loan Company, as plaintiff, against G. G. McKinnon and Lula McKinnon, as defendants, to foreclose a mortgage which was in default for approximately $3,000.

The Farmers Exchange Bank of Lindsay was made a party defendant and filed a cross-petition against defendants G. G. McKinnon and Lula McKinnon, seeking to foreclose a mortgage on the same lands for approximately $2,800.

Judgment was rendered in favor of the Monarch Loan Company, without contest, for the amount sued for, and also a judgment was rendered in favor of the Farmers Exchange Bank of Lindsay against Lula McKinnon and G. G. McKinnon for approximately the amount sued for.

For reversal of the judgment in favor of the Farmers Exchange Bank of Lindsay the defendants Lula McKinnon and G. G. McKinnon have appealed to this court, and assign numerous errors under two general propositions to the effect: First, that the trial court erred in refusing to allow the plaintiffs in error to prove the issues tendered by them; and, second, that the testimony shows that the plaintiffs in error had on deposit in the Farmers Exchange Bank $1,618, which should have been accounted for by the defendant bank.

Briefly stated, the following are the facts disclosed by the record:

G. G. McKinnon, in the fall of 1918, bought a considerable amount of cotton on bills of exchange drawn on the Farmers Exchange Bank, which were duly paid. He continued to buy cotton and had in his possession, on December 6, 1918, 94 bales of cotton stored in an open yard in the town of Lindsay. It appears that this cotton was unprotected from the weather and had deteriorated in quality, some of it having been damaged by the rain, and the outside of a number of bales had rotted.

The Farmers Exchange Bank had advanced to the defendant McKinnon the entire purchase price of cotton purchased by him, including this 94 bales, charging him 10 per cent. interest thereon.

In February and March, 1919, the 94 bales of cotton were shipped by the defendant McKinnon in the name of the Farmers Exchange Bank to Cleveland & Sons, cotton factors, in the city of Houston, Tex.

It appears that the tickets issued by the said cotton factors on said cotton were delivered into the custody of the bank under the contract of pledge incidental to the payment of said bills of exchange drawn by the defendant McKinnon, and paid by said bank.

It further appears that the said cotton factors advanced, according to the custom of the trade, to the Farmers Exchange Bank, a considerable sum of money which was used in retiring the bills of exchange drawn by the defendant McKinnon on said bank thereby eliminating the interest of McKinnon and his bills of exchange therefor to the extent of said advancements.

It further appears that the price of cotton had very materially decreased, and the bank, having advanced all of the purchase price of said cotton, was in a situation of losing a sum of money equal to the difference between the sum paid out and the market value of the cotton.

On December 6, 1918, the bank made a demand upon Mr. McKinnon to margin according to the usage and custom in that respect and the defendants McKinnon executed their note for $3,000, payable one year

after date, secured by a mortgage upon the homestead of the McKinnons.

It further appears that the said note was not executed for the purchase price of said cotton, but only for a sum representing a reasonable margin to protect the bank against loss by reason of the decline in the cotton market.

The bank thereupon continued to carry the whole of the purchase price of said cotton, amounting at the time the note was given to approximately $14,500, and thereafter, in the month of June, 1919, the market price of cotton had increased to such an extent as to reduce the loss which Mr. McKinnon had sustained because of the decline in the market.

It is contended by the defendant, McKinnon, that the 94 bales of cotton were sold in violation of the directions given by him to the bank; that he directed the bank to wire Cleveland & Sons to sell the cotton at 33 cents a pound "hog around."

The meaning of this phrase is said by counsel for the defendants McKinnon to be "that the buyer takes the cotton just as it is at a certain flat price, or all around. There is to be no classifying, checking, or reconditioning; just so many bales as they lie at so much per pound all around."

On June 12, 1919, the Farmers Exchange Bank instructed the said cotton factors to "sell the McKinnon cotton at price quoted, thirty-one fifty, or better."

Mr. Cleveland, the senior member of the cotton factor's firm, testified in answer to the question as to the meaning of the basis of 31.50 or better in the cotton business that "the selling instructions received from the bank directed us to sell the cotton at 31.50 or better, meaning 31.50 basis middling or better."

It is not disputed that on June 12, 1919, the cotton in question was sold at 31.75 "basis middling"; that the cotton factors furnished to the Farmers Exchange Bank an account sale showing in detail the classification of the cotton, the weight upon such sale, the price received, the total sums realized therefrom, together with the total charges against said cotton.

The record shows that the cotton in question was received by the cotton factors at Houston in a damaged condition.

Mr. Cleveland further stated that in the interior lists of cotton are frequently sold at what is termed the "hog around" price, carrying with it the understanding that the list is to be accepted as it stands and if bales in the list are damaged account is taken of the damages by the buyer, but without conditioning; that this practice cannot be followed in the factors' market for the reason that cotton factors cannot sell cotton at a "hog around" price, involving allowing no inspection; that the cotton sold by factors is sold allowing the buyer the privilege of inspection and rejection.

The controversy between the bank and the defendant McKinnon is that he directed the bank to wire the said cotton factors to sell the cotton at 33 cents per pound "hog around", and that the bank failed to comply with his directions.

It is not contended that the price obtained by the defendants, McKinnons, of 31.75, was less than the market price on the date of sale, nor is it contended that they did not receive full credit for the proceeds of the sale and that there remained a balance due the bank of approximately $2,800, for which sum suit on the note was instituted.

The theory of counsel for the McKinnons, as we understand it, is that the defendant bank would be liable for the difference between the amount actually received for the cotton, 31.75, per pound "basis middling", and what they sought to prove the bank was directed to sell said cotton for, 33 cents per pound "hog around."

There is no contention that the highest market price was not obtained or that cotton was worth 33 cents per pound "hog around" or that it was worth more than 31.75, basis middling, on the date of the sale.

Assuming that the bank wrongfully sold the said cotton in violation of the directions of the defendant McKinnon, as contended by him, the measure of damages, in view of the undisputed facts disclosed by the record, would be the value of the cotton at the date of the alleged conversion, June 12, 1919, together with interest at 6 per cent. per annum, and not the market value of the cotton at the time of the trial.

Section 5999, Comp. St. 1921, fixes the measure of damages for conversion of personalty as follows:

"The detriment caused by the wrongful conversion of personal property is presumed to be:

"First. The value of the property at the time of the conversion, with the interest from that time; or

"Second. Where the action has been prosecuted with reasonable diligence the highest market value of the property at

any time between the conversion and the verdict without interest at the option of the injured party; and

"Third. A fair compensation for the time and money properly expended in pursuit of the property."

The defendant McKinnon testified that he was informed by an employe of the bank four or five days after the cotton had been sold of that fact.

No objection was made at that time, or thereafter, to the sale; and the record further shows that the plaintiffs in error waited until long after the maturity of the note sued on herein and asserted no rights until June 23, 1920, more than one year after the alleged conversion.

"Whether an action for conversion has been prosecuted with reasonable diligence within the purview of the second subdivision of section 2752, Wilson's Rev. & Ann. Stat. 1903 (sec. 5999, Comp. St. 1921) is a question of law for the court." Funk v. Hendricks, 24 Okla. 837, 105 Pac. 352.

The facts relating to diligence in this case being undisputed, the question of diligence was purely for the court to determine.

In the case of Dunn v. Modern Foundry & Machine Co., 51 Okla. 465, 161 Pac. 893, the court said:

"The measure of damages for the wrongful conversion of personal property in this state is the value of the property at the time of the conversion, with the interest thereon, from the time of the conversion, at the rate of 6 per cent. per annum."

In instructing the jury to return a verdict in favor of the bank the court, as a matter of law, determined that plaintiffs in error had not commenced and prosecuted their action with diligence, and were not entitled to the highest market value of the property between the date of the alleged conversion and the time of the trial.

The trial court took the position, in view of the undisputed facts, that the only question on this branch of the case was whether or not the bank had properly accounted for the funds received.

The court, therefore, permitted the defendants to go fully into the matter of accounting. There was no question or contention that the bank had not accounted for all funds received by it and had applied the same upon the indebtedness of the defendants, McKinnons, to the bank.

An examination of the record discloses that on December 6, 1918, the date the note in question was taken by the bank, the defendant, G. G. McKinnon, was indebt-

ed to the bank on his cotton account in the sum of $13,190.76; that on December 9, thereafter, he bought cotton in the amount of $354.11, which the bank paid for; that on October 22, 1919, a final accounting was made on the cotton account, which disclosed that the bank received from Wm. D. Cleveland & Sons, cotton factors, $11,744.26, and that the defendant, G. G. McKinnon, then owed the bank, including interest on the money advanced for the purchase of the cotton, $14,544.26, leaving a balance due the bank of $2,800.

Furthermore, it appears conclusively from the record that the cotton sold by factors as this cotton was sold is never bargained for nor sold on the basis of "hog around," but is sold on "middling basis," subject to inspection and reconditioning.

The defendant McKinnon, being a local cotton buyer, must be presumed to have known the usages and customs universally prevailing in the cotton market, and to require Cleveland & Sons, the cotton factors, to sell the cotton in question at 33 cents per pound "hog around", that is, without inspection, would be equivalent to saying that the cotton should not be sold at all, and this is particularly so in view of the undisputed fact that the cotton, when shipped to the cotton factors, was in a damaged condition.

The second proposition submitted by counsel for plaintiffs in error is to the effect that the court refused to permit a cross-examination of the representative of the bank regarding the deposit of funds in said bank by defendant McKinnon.

The record discloses that the witness representing the bank testified in chief to nothing relating to a deposit of funds by the said defendant.

This alleged deposit was an affirmative defense set up by the plaintiffs in error, McKinnons, to the cross-petition of the defendant bank, and the burden was upon them to show affirmatively the deposit of said funds in said bank.

The court, we think, properly sustained an objection of the defendant bank to said testimony as not proper cross-examination.

The defendant, McKinnon, testified that he made inquiry on the 30th day of August, 1918, as to his balance, and that he was informed that he had $1,618. He admitted, however, that numerous checks were drawn on this deposit and while he denied that the bank furnished statements monthly, he testified that in April, 1919, he received a statement from the bank, together with his canceled vouchers. He further testified that

he did not remember whether the statement showed the balance of money he had in the bank. He produced no evidence of said deposit and admitted checks had been given against the same and that the canceled vouchers or some of them "were scattered around home"; and he admitted further he at no time demanded of the bank the said deposit, and that he made no complaint to the bank from the date of the furnishing of the bank statement in March or April, 1919, to the date of the trial, December 14, 1921, a period of more than two and one-half years.

It clearly appears, from the record, that the statement of the bank furnished to the plaintiffs in error, having become an account stated and no demand having been made upon the bank prior to the trial for the amount of the claimed deposit, there was no issue of fact in favor of the plaintiffs in error as against said bank in its action on the note.

If, in fact, said deposit was in said bank, to the credit of the plaintiffs in error, the presumption of law is that the bank remaining open for business will pay when proper demand has been made on said bank.

In the case of Koelzer et al. v. First National Bank (Wis.) 104 N. W. 838, the court said, in the first paragraph of the syllabus:

"A deposit in a bank subject to check imposes on the bank, in the absence of any contract to the contrary, the duty of paying, on account of the deposit, only on a proper demand therefor, by check at the bank during banking hours, and a breach of the bank's obligation to pay on proper demand is essential to a cause of action for the deposit and to set the statute of limitations running in respect to it."

We think the judgment of the trial court should be affirmed.

By the Court: It is so ordered.

Note.—See under (1) 38 Cyc. pp 2090, 2094, 2101. (2) 38 Cyc. p. 2107. (3) 7 C. J. p. 664, 679.